# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

_____

Justin Lamont Buckingham,                    **Civil No. 11-2489 (PJS/SER)**

       Petitioner,

v.                                           **REPORT AND RECOMMENDATION**

Jessica Symmes, Warden,

       Respondent.

_____

       Justin Lamont Buckingham, *pro se*, #226219, Minnesota Correctional Facility – Oak Park Heights, 5329 Osgood Avenue North, Stillwater, MN 55082, for Petitioner.

       J. Michael Richardson, Esq., Hennepin County Attorney's Office, 300 South Sixth Street, Suite C-2000, Minneapolis, MN 55487, for Respondent.

       Michael K. Walz, Esq., Hennepin County Attorney's Office, 300 South Sixth Street, Suite A-2000, Minneapolis, MN 55487, for Respondent.

       Matthew Frank, Minnesota Attorney General's Office, 445 Minnesota Street, Suite 1800, Saint Paul, MN 55101, for Respondent.

_____

STEVEN E. RAU, United States Magistrate Judge.

       Petitioner Justin Lamont Buckingham ("Buckingham"), currently a state inmate at the Minnesota Correctional Facility at Oak Park Heights, filed a Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody ("Petition") [Doc. No. 1] and Motion for Cause and Prejudice with Memorandum of Law in Support of Evidentiary Hearing ("Motion for Cause and Prejudice") [Doc. No. 11]. On May 15, 2012, this Court issued a Report and Recommendation recommending that Buckingham's Petition and Motion for Cause and Prejudice be dismissed pursuant to the doctrine of procedural default. (Report & Recommendation, "R&R") [Doc. No. 12]. Following appeal of the Report and Recommendation

by Buckingham, United States District Court Judge Patrick J. Schiltz issued an order remanding the case back to the undersigned for further consideration of two claims, Buckingham's Sixth Amendment and voluntariness claims.[1]  (Order dated Aug. 21, 2012) [Doc. No. 17 at 6–7]. Following additional briefing and supplementation of the record, those claims are now ripe for review.  For the reasons discussed below, the Court recommends that the Petition be denied and the action dismissed.

## I.     BACKGROUND

### A.     Underlying Offense and Police Contact Prior to Trial

On February 11, 2007, Buckingham and Larry Hatcher ("Hatcher") threatened Ricardo Walker ("Walker") during an argument outside a Minneapolis bar.[2]  After the argument, Walker drove away in a minivan.  When he stopped at an intersection, Buckingham and Hatcher pulled up alongside the van in an SUV.  Someone inside the SUV fired five or six shots at the minivan,

---

[1]      As Judge Schiltz noted in his Order,

Buckingham did not actually file an objection to the R&R. Instead, after Judge Rau issued the R&R, Buckingham filed a notice of appeal to the United States Court of Appeals for the Eighth Circuit. ECF No. 13. An R& R is not appealable, however. *See Loewen-America, Inc. v. Advance Distrib. Co.*, 673 F.2d 219, 220 (8th Cir. 1982) ("Parties may not appeal directly to this court from an order of a magistrate entered pursuant to a section 636(b) referral."). As a result, Buckingham's notice of appeal did not divest this Court of jurisdiction. *United States v. Meints*, 48 F.3d 1225, 1995 WL 64748, at *1 (8th Cir. Feb. 17, 1995) (per curiam) (unpublished table decision). The Court therefore construe[d] Buckingham's notice of appeal as an objection to the R&R.

(Order dated Aug. 21, 2012 at 2 n.1).

[2]      The description of the underlying offense provided here and the procedural history of the state court proceedings in Section I.B. are taken from the Minnesota Supreme Court's decision on Buckingham's direct appeal, *State v. Buckingham* (*Buckingham I*), 772 N.W.2d 64 (Minn. 2009), and his appeal of his petition for postconviction relief, *Buckingham v. State* (*Buckingham II*), 799 N.W.2d 229 (Minn. 2011).  The facts related to Buckingham's contact with the police in Section I.A. are taken from Sergeant Bruce Folken's testimony at a pretrial hearing in Minnesota state court.  (App., "Admin. R.") [Doc. No. 23 at 35–110].  Buckingham does not challenge the facts accepted by the state courts as they relate to the two claims addressed herein.

fatally striking Walker in the head.  When police officers rendered emergency assistance, Walker implicated Hatcher and another man before dying.  Hours later, police found the SUV outside Hatcher's residence.  Hatcher's fingerprints were discovered on the exterior of the driver's door and Buckingham's prints on the front passenger seat dashboard.

Three days later, on February 14, 2007, Buckingham voluntarily appeared for an interview with Sergeant Bruce Folkens ("Sergeant Folkens") and Sergeant Chris Karakostas ("Sergeant Karakostas").  Ultimately, the officers arrested Buckingham for his alleged involvement in the shooting.[3]  Sergeant Folkens initiated an interview with Buckingham and administered a *Miranda* warning.  *Buckingham I*, 772 N.W.2d at 68; (Admin. R. at 100).  Minutes into the interrogation, Buckingham requested legal representation.  (Admin. R. at 100).  Sergeant Folkens honored the request and the interview ended.  (*Id.*).  After this initial exchange, Buckingham contacted Sergeant Folkens several times expressing a desire to speak in the presence of his lawyer.  (*Id.* at 113).  Buckingham initiated each of these subsequent contacts.  (*Id.* at 100, 113).

First, on February 21, 2001, Sergeant Folkens received a voicemail reporting that an inmate at the Hennepin County Jail was attempting to reach him.  (*Id.* at 56).  The voicemail did not provide the inmate's identity, but because Buckingham's case was the only investigation Sergeant Folkens was conducting at the time, he believed it was Buckingham.  (*Id.*).  Sergeant Folkens met with Buckingham, who confirmed that he had called Sergeant Folkens "like 10 to 30 times."  (*Id.* at 57).  Sergeant Folkens began to record their conversation and read Buckingham his *Miranda* rights.  (*Id.*).  In response, Buckingham requested the presence of his lawyer.  (*Id.*).  Buckingham said his attorney was Arthur Martinez ("Martinez") and asked

---

[3]    It is unclear from the Minnesota state courts' decisions at what point during the questioning officers arrested Buckingham.  *See Buckingham I*, 772 N.W.2d at 68.

Sergeant Folkens to contact him. (*Id.* at 60, 81). Sergeant Folkens called Martinez, but reached his voicemail. (*Id.* at 60, 79–80). Sergeant Folkens was unable to leave a message because Martinez's mailbox was full. (*Id.* at 60).

One week later, on March 1, Sergeant Folkens received another call from Buckingham. (*Id.* at 60–61). Buckingham explained that he did not like to be recorded, but he had information for Sergeant Folkens and wanted his attorney present when they spoke. (*Id.* at 61). Again, Sergeant Folkens attempted to reach Martinez by phone, but found his mailbox full. (*Id.* at 62). He spoke with Martinez's assistant who explained that he was in trial. (*Id.*). Sergeant Folkens told Martinez's assistant that he would like Martinez to speak with Buckingham or him about meeting for an interview. (*Id.*).

The following day, March 2, Sergeant Folkens received two more voicemails from Buckingham. (*Id.*). Buckingham's messages requested that Sergeant Folkens "come up and talk to him." (*Id.*). Sergeant Folkens was unaware of any policy or training regarding his ability to meet with someone represented by counsel who requested to speak with him. (*Id.* at 83). He arrived at the jail with Sergeant Karakostas to interview Buckingham. (*Id.* at 62–63). Sergeant Folkens and Sergeant Karakostas recorded their conversation with Buckingham. (*Id.* at 63). Sergeant Folkens explained to Buckingham that he tried to call Martinez but had not been able to reach him and Martinez's secretary said he was in trial. (*Id.*). Sergeant Folkens explained the necessity of recording the interview, but Buckingham maintained his refusal to be recorded. (*Id.* at 63–64). Sergeant Folkens read Buckingham his *Miranda* rights and Buckingham stated that he wished to have his attorney present. (*Id.* at 63).

On March 6, Sergeant Folkens received a call from the detention deputy from Hennepin County Jail, who explained that Buckingham asked her to call and request Sergeant Folkens to visit him in jail. (*Id.* at 64). Sergeant Folkens and Sergeant Karakostas again went to the jail to see Buckingham. (*Id.*). Initially, Sergeant Folkens recorded the interview but, at Buckingham's request, the recorder was turned off. (*Id.* at 65). Sergeant Folkens turned the recorder on again once to read Buckingham his *Miranda* rights. (*Id.*). Buckingham responded by stating that he wished to speak with Sergeant Folkens and Sergeant Karakostas. (*Id.*). Sergeant Folkens reminded Buckingham about the absence of his attorney, but Buckingham said "it was fine to talk without his attorney present." (*Id.*). Sergeant Folkens told Buckingham that he would take copious notes of their interview because the recorder was turned off. (*Id.* at 66). Buckingham told him to "[g]o ahead and take [his] notes and turn the recorder off." (*Id*). Following the interview, Sergeant Folkens went over his notes line by line with Buckingham to ensure accuracy. (*Id.* at 66, 67). Buckingham affirmed the notes were an accurate summary of their conversation, but refused to sign or initial them. (*Id.* at 67). When he returned to his office, Sergeant Folkens used his notes for a report summarizing the conversation and then inventoried the original handwritten notes. (*Id.* at 66–67).

During the interview, Buckingham described the events of February 11, 2007. (*Id.* at 69). He recalled the altercation and shooting, implicating Michael Jackson ("Jackson") as the shooter. (*Id.* at 69–70). Buckingham revealed that he, Jackson, and others in the car at the time of the shooting subsequently met to concoct a story. (*Id.* at 71).

On March 30, Sergeant Folkens received yet another call from Buckingham, which he recorded. (*Id.* at 71–72). Buckingham told Sergeant Folkens he had been indicted and asked whether Sergeant Folkens verified the story he had provided on March 6. (*Id.* at 72).

Sergeant Folkens testified that he was "[a]bsolutely not" ever left with the impression that Buckingham was delusional in any manner during the course of their conversations. (*Id.* at 73). Sergeant Folkens said he had known and spoken to Buckingham over the course of a couple years and found the conversations normal. (*Id.*). Sergeant Folkens believed Buckingham appeared "very normal." (*Id.* at 75).

**B.     State Court Proceedings**

In 2008, a Minnesota jury convicted Buckingham of one count of aiding and abetting first-degree premeditated murder, one count of aiding and abetting first-degree drive-by shooting murder, two counts of aiding and abetting attempted first-degree premeditated murder, and five counts of aiding and abetting attempted first-degree drive-by shooting murder. He was sentenced to life in prison without parole, two 180-month consecutive sentences, and three 243-month concurrent sentences.

After he was convicted and sentenced, Buckingham took direct appeal of his conviction to the Minnesota Supreme Court, alleging (1) the trial court erred in admitting statements he made to police in violation of *State v. Scales*, 518 N.W.2d 587, 592 (Minn. 1994), and without the knowledge and consent of his attorney; (2) the State presented insufficient evidence to support his convictions for first-degree premeditated murder and attempted first-degree murder; (3) due to a mathematical error, his concurrent sentences for aiding and abetting attempted first-degree drive-by shooting murder exceeded the statutory maximum; and (4) prosecutorial misconduct. The Minnesota Supreme Court found all of Buckingham's substantive challenges were without merit and affirmed his conviction, but modified his sentence to correct a calculation error.

Buckingham subsequently filed a *pro se* petition for postconviction relief in Hennepin County District Court.[4] Again, he alleged that the district court improperly admitted testimony regarding statements he made to police. In addition, he asserted three new grounds for relief: (1) his court-ordered psychological evaluation was incomplete; (2) the jury instruction on accomplice liability was erroneous; and (3) his trial counsel was ineffective.

The postconviction court denied Buckingham's petition for relief without a hearing. The court rejected his claims on the merits and further concluded that *State v. Knaffla*, 243 N.W.2d 737, 741 (Minn. 1976), procedurally barred "most of Buckingham's claims." *Buckingham II*, 799 N.W.2d at 231. Buckingham challenged the postconviction court's decision on appeal. The Minnesota Supreme Court rejected Buckingham's assertions, finding that *Knaffla* barred his claims.

### C.    Federal Habeas Proceedings

Buckingham filed his habeas petition on August 29, 2011. (Pet. at 1). Jessica Symmes ("Symmes") filed a Motion to Dismiss, arguing that the issues raised in Buckingham's Petition were procedurally defaulted and that neither "cause and prejudice" nor a "fundamental miscarriage of justice" excused the procedural default. (Resp't's Mot. to Dismiss Pet. for Federal Habeas Corpus Relief) [Doc. No. 9]. Buckingham filed a Motion for Cause and Prejudice. [Doc. No. 11].

---

[4]    Ten days after Buckingham filed his petition for postconviction relief, he filed a federal habeas corpus petition listing five grounds for relief. *Buckingham v. Symmes*, 10-CV-3619 (PJS/SRN) [Doc. No. 1]. Because four of the grounds in that Petition had not been fully adjudicated in the state courts, Buckingham's petition could not be entertained at that time and was dismissed without prejudice. *Buckingham v. Symmes*, 10-CV-3619 (PJS/SRN) [Doc. Nos. 9, 10].

Buckingham asserted seven grounds for relief: (1) improperly admitted testimony regarding statements he made to police; (2) ineffective assistance of trial counsel; (3) trial court error in considering an incomplete psychological evaluation; (4) denial of fair trial because of failure of trial counsel and prosecutor to provide psychological evaluator with complete medical records; (5) unconstitutional jury instruction on accomplice liability; (6) ineffective assistance of appellate counsel; and (7) unconstitutional application of the *Knaffla* rule.[5]  On May 15, 2012, this Court issued a Report and Recommendation recommending dismissal of each of these claims pursuant to the doctrine of procedural default.  (R&R at 12–13).  Buckingham objected and the Honorable Patrick J. Schiltz issued an order adopting the Report and Recommendation in part and remanding it in part.  (Order dated Aug. 21, 2012).

Judge Schiltz found that Ground One—Buckingham's contention that the state court improperly admitted testimony regarding statements he made to police—was based upon four claims: (a) the statements had not been recorded as required by *State v. Scales*, 518 N.W.2d 587 (Minn. 1994) (the "*Scales* claim"); (b) police interrogated him in violation of his Sixth Amendment right to counsel (the "Sixth Amendment claim"); (c) his statements were involuntary due to the absence of counsel (the "voluntariness claim"); and (d) police violated his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966) by continuing to interrogate him after he invoked his right to counsel (the "Fifth Amendment/*Miranda* claim").  (*Id.* at 2–3) (citing *Buckingham II*, 799 N.W.2d at 232).  Acknowledging that "Buckingham's *pro se* petition is not a model of clarity," Judge Schiltz concluded that Buckingham's Sixth Amendment claim and the voluntariness claim were not procedurally barred and remanded those claims for consideration on their merits.  (Order dated Aug. 21, 2012 at 3).

---

[5]     Buckingham's Petition alleged the first five grounds for relief.  (Pet. at 26, 31, 35, 39, 42).  The Court construed his Motion for Cause and Prejudice as alleging last two grounds listed. (Motion for Cause and Prejudice at 2, 3–4).

The Court ordered Symmes to file a return including "[s]uch affidavits and exhibits, including certified copies of any court records, administrative records, or prison records, that may be germane to the issues raised in the Petition with respect to Buckingham's Sixth Amendment and voluntariness claims." (Order dated Feb. 22, 2013) [Doc. No. 20 at 2]. Buckingham subsequently filed a reply. (Petitioner Resp[o]nse to Respo[n]dent's Reply for Federal Habeas Corpus Relief, "Pet.'s Reply") [Doc. No. 25].

## II.    STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (codified as amended in scattered sections of 28 U.S.C.) ("AEDPA") prescribes the standards that govern this Court's substantive review of Buckingham's Habeas Petition. The relevant portion of AEDPA provides that:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

In *Williams v. Taylor*, 529 U.S. 362, 405–11 (2000), the United States Supreme Court discussed application of the AEDPA. State court decisions are "contrary to" Supreme Court precedent under § 2254(d) when the state court: (1) reaches a conclusion opposite to the Supreme Court on a question of law; or (2) arrives at a result opposite to Supreme Court precedent involving "materially indistinguishable" facts. *Id.* at 405. The "unreasonable

application" clause of § 2254(d)(1) provides that even if the state court correctly identifies the relevant Supreme Court principle, a prisoner's writ may be granted if the state court applied the principle unreasonably to the facts of the case. *Id.* at 413. The standard for determining whether a state court's decision is an "unreasonable application," is "whether the state court's application of clearly established federal law was **objectively unreasonable**. . . ." *Id.* at 409 (emphasis added). A writ may not be issued simply because the federal court concludes the state court's application of federal law was erroneous or incorrect, but only where the state court's decision was also unreasonable. *Id.* at 411.

A writ of habeas corpus may also be available where the state courts' resolution of a prisoner's criminal case is "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Habeas relief can, therefore, be granted if the conviction is based on findings of fact that could not be derived reasonably from the state court evidentiary record. When reviewing a state court decision, however, "a federal court . . . presumes that the state court's factual determinations are correct," and such a presumption "may be rebutted only by clear and convincing evidence." *Lee v. Gammon*, 222 F.3d 441, 442 (8th Cir. 2000).

A federal district court is not allowed to conduct its own *de novo* review of a prisoner's constitutional claims. *Grady v. Zanders*, No. 10-cv-768 (PJS/JJK), 2011 WL 2682947, at *5. Habeas relief cannot be granted unless the prisoner has identified, and substantiated, the specific state court error. *Id.* A prisoner must also demonstrate that the error is actionable under the Supreme Court's interpretation of § 2254(d). *See id.*

This rubric applies only when a claim has been fairly presented to, and decided on the merits by, the highest available state court. *See See Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (citations omitted); *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). Otherwise, when a state court remedy is available for a petitioner's unexhausted claim, the federal court must defer the action until the claim is exhausted. *Armstrong v. Iowa*, 418 F.3d 924, 926 (8th Cir. 2005). As a corollary, when a petitioner has not exhausted his state court remedies and state procedural rules preclude further attempts to do so, that claim is procedurally defaulted. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *McCall v. Benson*, 114 F.3d 754, 757 (8th Cir. 1997). Only if a petitioner shows "cause and prejudice" to excuse the procedural default or, in the alternative, that there would be a "fundamental miscarriage of justice" will a procedurally defaulted claim be considered. *Coleman*, 501 U.S. at 749–50.

## III.    DISCUSSION

Two of Buckingham's bases for Ground One remain for review: (1) the Sixth Amendment claim and (2) the voluntariness claim. Each ground is separate and distinct, and may serve as a barrier for admission of a statement into evidence. Buckingham's arguments with respect to these claims are nevertheless related. In both, Buckingham raises a number of issues related to his allegedly "ignored" or "denied" requests for the presence of his attorney during interrogations. (Pet. at 27). The Court's analysis with respect to the claims therefore necessarily overlaps. Ultimately, the record supports the conclusion that Buckingham waived his Sixth Amendment rights and provided statements voluntarily.

### A.    Sixth Amendment Claim

Buckingham argues that his Sixth Amendment right to counsel was abridged when, despite his requests for the presence of counsel, interrogation continued in Martinez's absence. (Pet. at 8–11)   According to the Minnesota Supreme Court, Buckingham first presented this claim in his direct appeal.  *Buckingham II*, 799 N.W.2d at 232.  In *Buckingham II*, the Minnesota Supreme Court declined to revisit Buckingham's Sixth Amendment claim because it was already raised and rejected on the merits in his direct appeal.  *Id.*   Because it was fairly presented and considered, this claim is ripe for federal review.  *See Baldwin*, 541 U.S. at 29 (citations omitted); *O'Sullivan*, 526 U.S. at 845.

In his Petition, Buckingham cites the Sixth Amendment and Supreme Court caselaw regarding Sixth Amendment rights during interrogations to argue that the state courts' decisions were contrary to or involved an unreasonable application of law.  (Pet. at 26–28, 29, 30) (citing U.S. Const. amend. VI; *Brewer v. Williams*, 430 U.S. 387, 404 (1977); *Massiah v. United States*, 377 U.S. 201 (1964)).  He asserts that he "requested the presence of counsel, on three custodial interrogations for protection of his rights, and for advice during police interrogations, and every request was denied."  (*Id.* at 27).   Buckingham further explains that after his requests were denied, "he began talking about the crime, in an attempt to defend and protect himself, [and] 'the interrogator(s) ignored [his] request for counsel and coaxed/manipulated him into explaining what he actually did not know, or see, concerning the crime.'"  (*Id.*) (quotations in original).  He notes that neither his "counsel nor police interrogators, had warned, or advised [him] that, 'unrecorded statements'—illegal[ly] obtained—could be used against him."  (Pet. at 27) (citing *United States v. Tillman*, 963 F.2d 137, 140–41 (6th Cir. 1992)).

Once an adversary proceeding has been initiated, the Sixth Amendment guarantees a defendant the right to have counsel present at all "critical" stages of the criminal proceedings.[6] *Montejo v. Louisiana*, 556 U.S. 778, 786 (2009) (citations omitted). Interrogation by the State is such a stage. *Id.* (citations omitted).

The Sixth Amendment right to counsel may be waived by a defendant, however, so long as relinquishment of the right is voluntary, knowing, and intelligent. *Id.* (citations omitted). A waiver of the Sixth Amendment right to counsel is valid only when it reflects "an intentional relinquishment or abandonment of a known right or privilege." *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938), *overruled in part on other grounds by Edwards v. Arizona*, 451 U.S. 477, (1981) (defining waiver as the "intentional relinquishment or abandonment of a known right"). In other words, the accused must "kno[w] what he is doing" so that "his choice is made with eyes open." *Adams v. United States ex rel. McCann*, 317 U.S. 269, 279 (1942) (citation omitted). That said, the decision to waive need not itself be counseled. *Montejo*, 556 U.S. at 786 (citation omitted). A defendant's waiver of *Miranda* rights is generally sufficient for finding a waiver of the Sixth Amendment rights, despite *Miranda*'s purported roots in the Fifth Amendment:

> As a general matter . . . an accused who is admonished with the warnings prescribed by this Court in *Miranda* . . . has been sufficiently apprised of the nature of his Sixth Amendment rights, and of the consequences of abandoning

---

[6] Neither party provided the date on which adversary proceedings were initiated against Buckingham for purposes of the Sixth Amendment's protections. Sergeant Folkens's testimony provided that Buckingham had been arrested and charged before the first interrogation on February 21, 2007. (Admin. R. at 56). An unverified, dated summary provided by Buckingham appears to confirm that testimony. *See* (Exhibit B: Record of State Court Proceedings in 27-CR-07-010410 and 27-CR-07-017899, Exhibits at 21–29, attached to Pet.). For purposes of reviewing Buckingham's Petition, the Court assumes adversary proceedings were initiated against him and that his Sixth Amendment protection attached prior to the first interrogation. *See Gilmore v. Armontrout*, 861 F.2d 1061, 1070 (8th Cir. 1988) (explaining that adversary proceedings are initiated "by way of formal charge, preliminary hearing, indictment, information or arraignment") (citations and quotations omitted)); *see also Beck v. Bowersox*, 362 F.3d 1095, 1102 (8th Cir. 2004) (noting that unless other proceedings have already begun, the Sixth Amendment right to counsel does not attach at the time of an arrest).

those rights, so that his waiver on this basis will be considered a knowing and intelligent one.

*Id.* at 786–87 (citing *Patterson v. Illinois*, 487 U.S. 285, 296 (1988))).

On direct appeal, the Minnesota Supreme Court found no improper contact occurred between Buckingham and law enforcement. *Buckingham I*, 772 N.W.2d at 71. This Court agrees. There is no doubt that Buckingham requested the presence of his counsel at the February 14, February 21, March 2, and March 6 interviews, and his attorney was never present. (Admin. R. at 57, 100, 113). There can be no serious doubt, either, that Buckingham deliberately initiated and invited contact with Sergeant Folkens, received his *Miranda* rights before each interrogation, and elected to waive those rights and reveal potentially incriminating information.[7] (*Id.* at 57, 63, 65); *see* (*id.* at 113). Under those conditions, the Court is convinced that Buckingham invoked his Sixth Amendment right to counsel. Those requests were not ignored or denied as Buckingham alleges; rather, he voluntarily, intelligently, and knowingly waived his Sixth Amendment right to counsel.

First, although the principal focus of Buckingham's Petition on this claim appears to be whether his waiver was intelligent and knowing, the Court notes that the circumstances support a finding that Buckingham's waiver was voluntary. *See* (Pet. at 27) (arguing that the trial court "focused only on the voluntariness el[e]ment[] factor and not the intelligence of the *Miranda* principal [sic] in making its determination and ruling that, the petitioner had waived his *Miranda*

---

[7] Buckingham does not deny the admission of the *Miranda* warnings prior to the February 14, February 21, March 2, and March 6 interviews. Based on his testimony, Sergeant Folkens did not Mirandize Buckingham during the March 1, 2007 phone call. (Admin. R. at 60–61). Buckingham does not appear to take issue with the omission of the *Miranda* warning at that time, however. Regardless, the lack of *Miranda* in that instance has no impact on Buckingham's Petition for two reasons. First, the record does not support the conclusion that the phone call was a custodial interrogation. *See Miranda*, 384 U.S. 444–45. Second, nothing in the record suggests the State introduced evidence of Buckingham's statements during that call. *Id.*

rights knowingly." (quotations omitted)); (Pet.'s Reply at 4) ("The courts focused only on the voluntary element of the statement and not the intelligence of the "*Miranda* Principle" in making their determination and ruling that petitioner waived his *Miranda* rights knowingly." (italics added)).   As explained further below, the statements at issue here were the products of conversations Buckingham initiated.   Buckingham called Sergeant Folkens to request each meeting, asking him to come to the jail to talk to him.   Though he repeated his request for counsel, Buckingham instigated and invited Sergeant Folkens's appearance and questioning. Furthermore, if at some point Buckingham changed his mind about speaking with the officers, he could have simply opted to remain quiet and exercise his right.   *See Miranda*, 384 U.S. at 445 ("The mere fact that he may have answered some questions or volunteered some statements on his own does not deprive him of the right to refrain from answering any further inquiries until he has consulted with an attorney and thereafter consents to be questioned.).   Finally, nothing suggests the officers used any force, violence, threats, coercion, or promises to elicit the waiver.

Second, the repeated and uncontroverted *Miranda* warnings informed Buckingham of his right to have his counsel present during the questioning.   By telling him he had the right to consult with an attorney, to have a lawyer present while questioned, and even to have a lawyer appointed for him if he could not afford to retain one on his own, Sergeant Folkens conveyed the sum and substance of the rights the Sixth Amendment provided him.   *See Patterson*, 487 U.S. at 293.   "Indeed, it seems self-evident that one who is told he has such rights to counsel is in a curious posture to later complain that his waiver of these rights was unknowing."   *Id.* (internal quotation and citation omitted).   There is little more that could have possibly been done to satisfy the knowing portion of any waiver inquiry.

Third, the *Miranda* warnings also served to make Buckingham aware of the consequences of his decision to waive his Sixth Amendment rights during interrogation. Buckingham was informed that any statements he made could be used against him in subsequent criminal proceedings. This is the primary adverse consequence Buckingham could have suffered by virtue of his choice to make uncounseled statements to the authorities. This warning also sufficed to inform Buckingham of what his lawyer could do to protect him during questioning: namely, advise him to refrain from providing potentially incriminating statements—whether those statements were recorded or not. By knowing what could be done with any statements he might make, and therefore, what benefit could be obtained by having the aid of counsel while making such statements, Buckingham was essentially informed of the possible consequences of going without counsel during questioning. *Id.* at 293–94 (considering same concept in context of postindictment questioning and finding suspect was informed).

Buckingham received his first *Miranda* warning on February 14 and invoked his right to counsel. (Admin. R. at 113). Sergeant Folkens provided a second *Miranda* warning on February 21. (*Id.* at 57). Again, Buckingham invoked his right to counsel. (*Id.*). A third *Miranda* warning and Buckingham's third invocation occurred on March 2. (*Id.*). Then, on March 6, after his fourth *Miranda* warning, Buckingham choose to waive his right to counsel and speak with Sergeant Folkens. (*Id.* at 65). Sergeant Folkens reminded Buckingham that his attorney was not present, but Buckingham said that he would talk with him. (*Id.* at 65–66). Prior to that interrogation, each time Buckingham invoked his right to counsel, law enforcement ended the interrogation and returned only at Buckingham's request. Buckingham's repeated invocations of his right to counsel before the March 6 waiver establish that he knew his rights and how to raise them. The Court finds no reason to conclude his waiver on March 6 was involuntary,

unintelligent, or unknowing.

Buckingham also argues that a finding of a waiver is improper because, "all questioning (interrogatories) should have ceased when/once [he] requested counsel." (Pet. at 27). Buckingham is correct to the extent he claims that any alleged waiver of a defendant's right to counsel is invalid where police initiate an interrogation after the invocation of a Sixth Amendment right to counsel. *See Brewer*, 430 U.S. at 400–01 (finding that once Sixth Amendment attaches, law enforcement may not attempt to obtain incriminating information without the presence of counsel or waiver by suspect). The outcome may be different where, as here, interrogation subsequent to invocation is defendant-initiated. *See Michigan v. Jackson*, 475 U.S. 625, 635–36 (1986), *overruled on other grounds by Montejo*, 556 U.S. at 797; *see also Owens v. Bowersox*, 290 F.3d 960, 962–63, 964 (8th Cir. 2002), *cert. denied*, 537 U.S. 1035 (2002) (internal citations and quotations omitted) ("[O]nce a defendant invokes his or her right to counsel, the defendant's initiation of police interrogation is necessary but not sufficient to establish a waiver of that right."). Where a defendant reinitiates contact with police, the ultimate inquiry is whether the circumstances as a whole (including the initiation) indicate that the waiver was voluntary, knowing, and intelligent. *Owens*, 290 F.3d at 964 (citation omitted).

A defendant "initiates" an interrogation if he or she "evince[s] a willingness and a desire for a generalized discussion about the investigation." *Owens*, 209 F.3d at 963. This Court has not located and the parties have not cited any Supreme Court cases that address the waiver of the Sixth Amendment right-to-counsel when a defendant expresses a willingness to initiate an interrogation to the police through a third party. Research reveals many circuit courts have concluded that a third party's re-initiation of contact with police on behalf of a suspect may satisfy the waiver requirements of the Fifth and Sixth Amendments' right to counsel. *See Van*

*Hook v. Anderson*, 488 F.3d 411 (6th Cir. 2007) (en banc), *cert. denied* 552 U.S. 1023 (2007) (Fifth Amendment); *Owens*, 290 F.3d at 963–94 (8th Cir. 2002) (Sixth Amendment); *United States v. Michaud*, 268 F.3d 728, 735–36 (9th Cir. 2001) (Fifth Amendment).  For example, in *Owens v. Bowersox*, the defendant's mother contacted police, stating she persuaded her son to talk to police and tell the truth.  *Id.* at 962.  The trial court found that the interrogation's impetus came from the defendant through his mother, although Owens did not contact police himself and did not ask his mother to have police come to the jail.  *Id.* at 963.  The Eighth Circuit upheld the finding, noting that "the state's position undoubtedly would be stronger if Mr. Owens himself had contacted the police."  *Id.* at 963.  Nevertheless, the court found Owens's communications through his mother evidenced a willingness and desire to talk with the police sufficient to find a valid waiver.  *Id.* at 963–64.

Here, as noted above, Buckingham instigated and initiated all contacts with law enforcement subsequent to the invocation of his Sixth Amendment rights.  Where Buckingham personally contacted Sergeant Folkens, his intention to contact and further communicate with police is clear.  The March 6 call evidences the same intention because a detention officer made the call on behalf of Buckingham and at his direction.[8]  (Admin. R. at 64); *see Owens*, 280 F.3d at 963.  Buckingham's outreach to Sergeant Folkens was not the consequence of any questioning or prompting by law enforcement.  Rather, his phone calls to Sergeant Folkens—whether personally executed or made at his direction—were spontaneous and voluntary.  Furthermore, his

---

[8]   The Court acknowledges that on March 6, 2007, a detention officer contacted Sergeant Folkens on behalf of Buckingham.  (Admin. R. at 64).  It is unclear why Buckingham could not make this call himself as he had in the past.  According to Sergeant Folkens's testimony, Buckingham asked the detention officer to call Sergeant Folkens to request that he visit Buckingham in jail.  (*Id.*).  Buckingham does not dispute this testimony.  Given that the call was made at Buckingham's request and considering the numerous phone calls he previously made to Sergeant Folkens to request a visit, this Court finds his conduct "evince[d] a willingness and a desire" to talk to law enforcement.  *Owens*, 280 F.3d at 963.

requests to speak with the officers in the presence of his counsel and provide information evince a willingness and desire to speak with police about the investigation, and an awareness of the consequences of doing so. Thus, Buckingham's re-initiation of contact with police and subsequent waiver of his Sixth Amendment rights was voluntary, knowing, and intelligent.

Buckingham cites *United States v. Tillman*, 963 F.2d at 140–41, arguing that his waiver could not have been voluntary, knowing, and intelligent because his counsel or police failed to warn or advise him that "unrecorded statements"—illegal[ly] obtained—could be used against him." (Pet. at 27). But *Tillman* does not require such an explicit warning about unrecorded statements.

In *Tillman*, the defendant argued that his statements must be suppressed because the arresting officer failed to provide an adequate *Miranda* warning. *Id.* at 140. Specifically, Tillman claimed suppression was appropriate because the officer omitted notice that any statements he made could be used against him and that he was entitled to an attorney before and during questioning. *Id.* The court agreed, finding although *Miranda* did not require any "magic words," it required that certain elements be conveyed. *Id.* at 141. The court ruled that the arresting officers failed to adequately express Tillman's rights under the law and held that his statements should be suppressed. *Id.* at 141–42.

*Tillman* is inapposite. The contention there was the sufficiency of a warning that omitted two essential *Miranda* elements the Supreme Court identified. *Id.* at 140. *Miranda* requires notice of the following: the right to remain silent, an explanation that anything said can and will be used against the individual in court, the right to consult a lawyer and to have a lawyer present during interrogation, notice that if the person cannot afford an attorney, one will be appointed. *Miranda*, 384 U.S. at 444–45. These rights do not need to be read in any particular order. *See*

*California v. Prysock*, 453 U.S. 355 (1981). Nor do they need to match precisely the language of the *Miranda* decision. *Id.* In determining whether a defendant was informed of his *Miranda* rights adequately, "[t]he inquiry is simply whether the warnings reasonably 'conve[y] to [a suspect] his rights as required by *Miranda*.'" *Florida v. Powell*, 559 U.S. 50, 60 (2010) (citations omitted). Here, according to Buckingham, for a valid waiver of *Miranda* to occur, the warning must include an explicit caution that recorded **and unrecorded** statements may be used against a defendant. (Pet. at 27). *Miranda*, its progeny, and Sixth Amendment right to counsel cases do not require such a warning.

Buckingham does not challenge the sufficiency of the warnings he received regarding the rights specified by the Supreme Court. Most importantly, he does not allege that Sergeant Folkens failed to put him on notice that his statements could be used against him. Nothing in the record suggests that Sergeant Folkens failed to adequately and fully convey Buckingham's rights by providing a proper *Miranda* warning. Buckingham has not cited, and this Court has not uncovered, any federal law requiring Sergeant Folkens to explain explicitly that both recorded and unrecorded statements could be used against Buckingham.

Finally, Buckingham's reply also relies on the Fifth Amendment's protection to argue that the interrogation after he invoked his right to counsel was improper. (Pet.'s Reply at 1, 4–5). As noted in Judge's Schiltz's Order, the Minnesota Supreme Court found that claim procedurally barred under state law because Buckingham failed to raise it on direct appeal. (Order dated Aug. 21, 2012 at 6). Generally, a federal court may not second guess a state supreme court's holding that a claim is procedurally barred under state law. (Order dated Aug. 21, 2012 at 6) (citing *Sweet v. Delo*, 125 F.3d 1144, 1151 (8th Cir. 1997) ("If the highest court of Missouri concludes that Sweet's claims have not been raised properly in a state habeas

proceeding, that is the end of the matter."). Accordingly, a claim under the Fifth Amendment may not be reviewed here. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 842–45 (1999).

In sum, the Minnesota state courts' consideration of Buckingham's Sixth Amendment claim and his waiver of right to counsel was not contrary to clearly established federal law, an unreasonable application of such law, or based on incorrect factual issues. Thus, habeas relief is foreclosed on this claim.

### B. Voluntariness Claim

In his Petition, Buckingham also claims his "will was over-borne due to stress, fear, anxiety, gun-shot wound to head . . . and the confusion, caused by the continuous absence and denial of counsel at his custodial interrogations." (Pet. at 29). Buckingham contends that "the contin[u]ous denial of counsel" was a "subtle form of interrogation . . . to elicit incriminating information." (*Id.* at 28–29). These assertions constitute a claim that his statements were involuntary in violation of the Due Process Clause. *See United States v. Vega*, 676 F.3d 708, 718 (8th Cir. 2012) ("A statement is involuntary when it is extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity of self-determination." (citation and quotations omitted)). As Judge Schiltz noted, "[o]n its face, *Buckingham I* does not appear to address such a claim. But, in *Buckingham II*, the Minnesota Supreme Court stated that it had 'briefly addressed and implicitly rejected Buckingham's third contention that his statements were involuntary due to the absence of counsel.'" (Order dated Aug. 21, 2012 at 5) (citing *Buckingham II*, 799 N.W.2d at 232). As Judge Schiltz stated, this provides a basis for concluding the Minnesota Supreme Court, in its own view, had decided the voluntariness claim on the merits in *Buckingham I*, at least to the extent it was based on the absence of counsel. (*Id.* at 4–5) (citing *Cone*, 556 U.S. at 468 ("When a state court declines to

find that a claim has been waived by a petitioner's alleged failure to comply with state procedural rules, our respect for the state-court judgment counsels us to do the same.")).  Based on the Minnesota Supreme Court's assertion, the claim is proper for review on the merits.  This Court's review, however, is confined to the extent Buckingham claims his statements were involuntary because of "the confusion, caused by the continuous absence and denial of counsel at his custodial interrogations."[9]  (Pet. at 29).

---

[9]  Even if the Court were to consider Buckingham's other claims related to the voluntariness of his statements, the outcome would be the same.  Presumably in support of his claim, Buckingham submitted records from a mental health center dated from 2000 through 2001, (Mental Health Center Records, Ex. A at 1–8, attached to Pet.), and literature on conduct disorders, (Facts for Families: Conduct Disorder, Ex. A at 15–20).  Nevertheless, nothing suggests Buckingham experienced "stress, fear, [or] anxiety" so intensely that his statements were involuntary.  (Pet. at 29).  To the contrary, Buckingham repeatedly reached out to speak with Sergeant Folkens, who testified that his conversations with Buckingham were not out of the ordinary and that Buckingham appeared "very normal."  (Admin. R. at 75).  Buckingham had the presence of mind to determine that he would benefit from the attendance of his counsel and lodge that request with the officers during three interrogations.  Buckingham's will was not overborne; he clearly and voluntarily expressed his desires.  As for the March 6 interview, Buckingham elected to speak with the officers after his *Miranda* warning and a reminder that his counsel was not present.  After the interview, Buckingham reviewed Sergeant Folkens's notes with him, line by line, before agreeing that the notes accurately captured their conversation.  Those actions were of his own volition and do not suggest that his will was overborne or his capacity for self-determination was impaired.  Furthermore, "[a] statement cannot be rendered involuntary by the incapacity of the defendant alone; there must be some coercive police activity."  *United States v. Anaya*, 715 F. Supp. 2d 916, 932 (D.S.D. 2010) (citing *Colorado v. Connelly*, 479 U.S. 157, 164, 167 (1986)).  As noted herein, nothing in the record suggests any coercive police activity.

As for the gunshot wound to the head, although Buckingham provides medical records presumably related to this injury, he does not describe and the record contains no evidence of how this injury prevented him from voluntarily waiving his *Miranda* rights and acquiescing to Sergeant Folkens's questioning.  (Medical Record dated Nov. 17, 2006, Ex. A at 9–14, attached to Pet.).  Based on Buckingham's repeated invocation of his rights, there is no reason to believe the injury affected his capacity to later voluntarily waive his rights.  Nothing in the record suggests that Buckingham's head injury—or any other mental or physical factor—resulted in an inability to understand the substance of the *Miranda* warnings, his constitutional rights, or the situation.

The Petition does not identify which statements or interrogations were involuntary for purposes of this claim. Buckingham's reply suggests that his voluntariness argument applies to the statements made during the March 6 interrogation. (Pet.'s Reply at 1–2). Regardless, the analysis and conclusions below apply with equal force to each of the Buckingham's interrogations.

As construed by the Court, Buckingham claims his statements violate the Due Process Clause because they were obtained involuntarily due to the absence of his counsel. A confession or incriminating statement violates a defendant's due process rights only if the confession or statement is involuntary. *See United States v. Aldridge*, 664 F.3d 705, 712 (8th Cir. 2011). "A statement is involuntary when it was extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination." *Vega*, 676 F.3d at 718 (citation omitted). To determine whether a confession is voluntary, courts consider "the totality of the circumstances, examining both the conduct of the officers and the characteristics of the accused." *Id.* (citation omitted). This includes "among other things, the degree of police coercion, the length of the interrogation, its location, its continuity, and the defendant's maturity, education, physical condition, and mental condition." *Id.* (quotation and citation omitted). "Whether a defendant 'received *Miranda* warnings only moments before he made his incriminating statements . . . [is] a consideration [the Supreme Court has] treated as important, although not dispositive,' in determining voluntariness." *Id.* (citing *Rawlings v. Kentucky*, 448 U.S. 98, 107 (1980)). "[C]oercive police activity is a necessary predicate to the finding that a [statement] is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *See Connelly*, 479 U.S. at 167. In looking at the totality of the circumstances, the Court is convinced that Buckingham's statements were

voluntary despite his counsel's absence.

Buckingham's voluntariness argument appears to stem from his allegedly "ignored" or "denied" requests for the presence of counsel. (Pet. at 27). Despite Buckingham's claims, his requests were never ignored or denied. Buckingham was advised immediately of his *Miranda* rights, including his right to have counsel present, at the beginning of each interrogation. His responses establish that he understood the role of counsel, the gravity of the situation, his rights, and how to invoke them.

During the first three interrogations, on February 14, 21, and March 2, Buckingham had the wherewithal and foresight to invoke his right to counsel. (Admin. R. at 57, 65). After Buckingham invoked his rights on February 21, he asked Sergeant Folkens to contact his attorney. (*Id.* at 60, 81). Sergeant Folkens attempted to call Martinez and explained his attempts to Buckingham on March 2. (*Id.* at 65). On March 6, 2007, Buckingham responded to the *Miranda* warning by electing to speak with the officers. (*Id.* at 65). Sergeant Folkens reminded Buckingham that Martinez was not present, but Buckingham said "it was fine to talk without his attorney present." (*Id.*). Buckingham decided to speak with officers without his attorney—as he is permitted to do. Prior to that, each time Buckingham requested the presence of his counsel after being Mirandized, police questioning stopped and the officers left. (*Id.* at 60, 79–80). Similarly, Buckingham's March 1 request that his attorney be present during the interrogation further confirms that Buckingham understood his right to counsel, how to invoke it, and had no trouble doing so. (*Id.* at 61). Buckingham's decision to re-initiate communication and invite further contact with Sergeant Folkens does not render his statements involuntary—to the contrary, these decisions underscore the voluntariness of his statements.

Furthermore, Buckingham does not allege and the record contains no evidence that Sergeant Folkens, Sergeant Karakostas, or any other law enforcement officer threatened, used violence or promises, or intimidated Buckingham in an attempt to elicit information or a confession. Buckingham's repeated outreach to Sergeant Folkens and expressed desire to speak with him simply do not evoke the gross abuses of rights and police coercion that the voluntariness standard of the Due Process clause is meant to prevent. *See Mincey v. Arizona*, 437 U.S. 385, 399–401 (1978) (interrogation while in pain and shock while lying on back on a hospital bed, encumbered by tubes, needles, and breathing apparatus; isolated from family, friends, and legal counsel; and in and out of consciousness); *Payne v. Arkansas*, 356 U.S. 560, 566–67 (1958) (a mentally disabled 19-year-old youth, denied food for long periods, and threatened with mob violence that "there would be 30 or 40 people there in a few minutes that wanted to get him."); *Brown v. Mississippi*, 297 U.S. 278, 281–82, 285–86 (1936) (beatings and physical torture). Under the circumstances, Buckingham's statements were voluntary, despite the absence of his counsel. Nothing in the record suggests that Buckingham's will was overborne or his capacity for self-determination was impaired.

No facts support a conclusion that Buckingham's statements were involuntary for purposes of the Due Process Clause due to the absence of his counsel. Rather, they suggest that Buckingham recognized the seriousness of his situation and thought that providing information to officers would help him receive leniency for his alleged involvement in the crime. The Minnesota courts' decisions were neither contrary to clearly established federal law nor were they an unreasonable application of that law. Lastly, the decisions were not based on incorrect factual determinations. This Court recommends dismissal of Buckingham's voluntariness basis for Ground One of his Petition.

## IV.    CERTIFICATE OF APPEALABILITY

A § 2254 habeas corpus petitioner cannot appeal a denial of his petition unless he is granted a Certificate of Appealability, ("COA"). 28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b)(1). A COA cannot be granted, unless the petitioner "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(3). To make such a showing, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. Daniel*, 529 U.S. 473, 484 (2000). In this case, the Court finds it unlikely that any other court, including the Eighth Circuit Court of Appeals, would decide Buckingham's claims any differently than they have been decided here. Buckingham has not identified, and the Court cannot independently discern, anything novel, noteworthy, or worrisome about this case that warrants appellate review. It is therefore recommended that Petitioner not be granted a COA in this matter.

## V.    RECOMMENDATION

Based upon the foregoing and all of the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.    Buckingham's Petition Under 28 U.S.C. §2254 for Writ of Habeas Corpus by a Person in State Custody [Doc. No. 1] be **DENIED**; and

2.    Respondent Symmes's Motion to Dismiss [Doc. No. 8] be **GRANTED** in full; and

3.     Buckingham **NOT** be granted a Certificate of Appealability.

Dated:  July 15, 2013

                                                s/ Steven E. Rau
                                                STEVEN E. RAU
                                                United States Magistrate Judge


Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by July 29, 2013, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.  A party may respond to the objecting party's brief within ten days after service thereof.  A judge shall make a de novo determination of those portions to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable to the Court of Appeals.